**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **TOMEKA E. SHOCKLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **5:04-cv-426 (HL)** |
| | : | |
| **REBOUND, INC. d/b/a HEALTHSOUTH** | : | |
| **CENTRAL GEORGIA** | | |
| **REHABILITATION HOSPITAL,** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R

Before this Court is Defendant's Motion for Summary Judgment (doc. 42). For the reasons set forth below, Defendant's motion is GRANTED.

## I.     FACTS

Construing the facts in the light most favorable to Plaintiff, the non-moving party, the Court finds as follows. Plaintiff, a black female, began her employment with Health South Central Georgia Rehabilitation Hospital ("Hospital") on August 5, 2002 as a full-time licensed practical nurse ("LPN"). During her first week at the Hospital, Plaintiff was trained during an orientation session led by Vivian Lewis, a patient care coordinator. Plaintiff was initially assigned to the night shift on Unit One. Shortly thereafter, she transferred to an evening shift on Unit Two to better fit her schedule. Plaintiff experienced some difficulty working with the other nurses on Unit Two and ultimately transferred back to Unit One. After working the evening shift on Unit One for about five months, Plaintiff desired more of a challenge and requested a transfer to the faster paced day shift. In or around February 2003, Plaintiff was assigned to a day shift back on Unit Two, as no day shift positions were available in Unit One. Plaintiff remained on the day shift in Unit Two until she was

terminated in February 2004.

When assigned to the Unit Two day shift, Plaintiff was typically assigned to eight or nine patients at a time. As an LPN, Plaintiff was responsible for the overall care of these patients. Day shift LPNs were expected to obtain a report detailing the condition of each assigned patient from the nurse who cared for the patient overnight. After reviewing the report, LPNs prepare to dispense medication to those patients who require it. The process for dispensing medication included cross-referencing the Medication Administration Record ("MAR") with the physicians's orders contained in the patient's medical record. Each patient's medication was stored in a separate drawer in the medication cart–LPNs were expected to retrieve the medication from the drawer, verify that the medicine and the dosage were correct as listed on the MAR, and then administer the medicine to the patient, ensuring that the patient had in fact ingested the medicine. This process would be repeated for each patient assigned to an LPN that required medication.

After all of the patients received their necessary medication, an LPN is required to perform daily assessments on all of his or her assigned patients and record the results in the patient's medical record. The daily assessment of a patient assigned to an LPN consisted of the completion of eleven tasks: (1) evaluate the patient's pain level, (2) take the patient's pulse, (3) listen to the patient's heart sounds, (4) listen to the patient's lungs, (5) listen to the patient's abdomen, (6) evaluate the patient's bowel movements and urinary output, (7) palpate the patient's legs and check for swelling, (8) examine the patient's skin for abrasions, bruises, or decubitas ulcers, (9) evaluate the patient's cognitive function, (10) evaluate the patient's wounds and change the dressing, and (11) educate the patient in accordance with Hospital policy. On average, a routine assessment would take between five and fifteen minutes to complete. Needless to say, it is critical that the assessment be completed

as thoroughly as possible and that it be added to the patient's medical record to ensure that the healthcare providers charged with caring for the patient have an accurate medical status of the patient.

Throughout her assignment to the Unit Two day shift, Plaintiff's supervisors were Keith Ryals and Howard Goldey, both white males. While under the supervision of Keith Ryals, Plaintiff was subjected to remarks she perceived to be offensive in nature. Plaintiff accused Ryals of making numerous comments including the phrase "you people" when addressing Plaintiff. The specific comments Plaintiff recalled that she considered offensive included: (1) "You people are always complaining. What you can't handle a little work? That's why you people can't keep a job, you're always complaining about something."; (2) "You people take things too seriously, get back to work."; (3) "What do you people do to your kids? Something is always wrong with them."; (4) "You people have issues."; (5) "Good grief. You people are always changing your hair. I don't know who you're going to be from one day to the next."; and (6) "What you can't handle a little pressure? You people always jumping up and down like little monkeys. You want someone else to do your work for you." In addition to these specific comments, Plaintiff alleges that Ryals's use of the phrase "you people" when making comments directed towards her persisted for months while she was under his supervision. According to Plaintiff, in addition to comments including the "you people" reference, Ryals also made off-color remarks regarding Plaintiff's hair, her ability to afford a car and pay insurance, her mother's weight, and her overall work ethic.

In response to her supervisor's comments, Plaintiff requested a transfer from Marcy Jackson, the Hospital's Human Resource Manager, back to Unit One where she would no longer be under the supervision of Ryals. This first request was made on or around November 2003, and Jackson told

Plaintiff that she would look into a possible transfer.  Later, after Ryals allegedly made an offensive comment regarding Plaintiff's mother, Plaintiff again complained to Jackson.  On or around December 25, 2003, Plaintiff wrote Jackson a letter again complaining about Ryals's comments and again requesting a transfer back to Unit One.  Finally, on or around January 12, 2004, Plaintiff complained to Jackson about what she thought were inappropriate and offensive comments.  On this day, Plaintiff was also placed on probation for excessive absenteeism.  Plaintiff complained to Jackson that she thought such a measure was harsh and unfair.  Despite numerous complaints made to Jackson, Plaintiff never reported Ryals's behavior to Susan Smith, the Director of Nursing ("DON").

On January 30, 2004, Plaintiff arrived at work at 7:21 am, twenty one minutes late.  That day, Plaintiff was assigned to six patients, and after arriving at work, she dispensed medication and performed assessments patient.  By 8:45 am, Plaintiff was arranging her patient's charts as she normally would do after completing her morning tasks.  Ryals, who was aware of Plaintiff's tardiness was skeptical that she could have dispensed medication and assessed all of her patients in less than an hour and a half.  Doubtful that Plaintiff had actually performed her duties, Ryals investigated whether Plaintiff had actually assessed all of her patients.  Ryals spoke with two of Plaintiff's patients about what Plaintiff had done that morning.  Ultimately, Ryals concluded that Plaintiff had not properly assessed her patients that morning, and that her acknowledgment of such through completed assessment forms was tantamount to falsifying documents.  Ryals reported his findings to Smith, the DON.  Smith conducted her own investigation of the events of morning of January 30, 2004, and ultimately concluded that Plaintiff had falsified documents.  Plaintiff was subsequently terminated for this behavior.

Plaintiff filed a notice with the EEOC and timely filed her Complaint with the Court. After the completion of discovery, Defendant filed this motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

If "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," then summary judgment must be granted. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the non-moving party. Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995). The Court may not, however, make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" which would entitle the moving party to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted). If the moving party meets this burden, the burden then shifts to the non-moving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the non-moving party is not entitled to a judgment as a matter of law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this scheme summary judgment must be entered "against a party who fails

5

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.    DISCUSSION

Plaintiff asserts three claims under Title VII of the Civil Rights Act of 1964: (1) discrimination on the grounds that Defendant failed to discipline employees outside Plaintiff's protected class in a manner consistent with the disciplinary action received by Plaintiff; (2) harassment on the grounds that Defendant subjected Plaintiff to a hostile work environment; and (3) retaliation on the grounds the Defendant terminated Plaintiff after Plaintiff engaged in a protected activity. Plaintiff also alleges wrongful termination under the state law of Georgia.

The claims alleged in Plaintiff's Complaint are based solely on circumstantial evidence. See Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393-94 (11th Cir. 1997) ("[Circumstantial] evidence suggests–but does not prove–a discriminatory motive."). Employment discrimination claims supported only by circumstantial evidence are analyzed under a burden-shifting framework created by the Supreme Court of the United States in McDonell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

### A.    Wrongful discharge

Defendant asserts that a prima facie case of discrimination cannot be established because Plaintiff cannot show that similarly situated individuals outside Plaintiff's protected class were treated more favorably.  To prevail on a claim for discrimination under Title VII based on circumstantial evidence, Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a

similarly-situated individual outside her protected class. <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003). Once Plaintiff makes this prima facie showing, the burden then shifts to Defendant to provide a specific legitimate non-discriminatory reason for disciplining the employees differently. <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000) (citing <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254-55 (1981)). Finally, Plaintiff must show that Defendant's legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the treatment was motivated by illegal discrimination. Id. (citing <u>Burdine</u>, 450 U.S. at 256).

In the case at bar, Plaintiff has not carried her prima facie burden. While it is both clear and undisputed that Plaintiff has satisfied the first three elements of a prima facie case, Plaintiff has not established that Defendant treated her less favorably than a similarly-situated individual outside her protected class. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." <u>Id.</u>

Here, Plaintiff cannot show differences in the disciplinary actions received by her and other employees, because Plaintiff cannot show that other employees were involved in the same or similar conduct. Plaintiff's evidence that other employees were involved in falsifying patient medical records is largely based on inadmissable hearsay and occurrences to which Plaintiff lacks personal knowledge. Plaintiff alleges that she witnessed her supervisor, Howard Goldey, completing

information on the medical chart of a patient whom he had not provided care. But, Plaintiff admits that she has no actual knowledge of which patient charts Goldey signed or whether that patient had actually been assigned to Goldey. Plaintiff also alleges that she overheard two RNs discussing that they had signed patient charts on behalf of other RNs. But, Plaintiff can offer no testimony to corroborate these occurrences and no other RNs have admitted to engaging in the falsification of patient records.

Furthermore, Plaintiff cannot allege that her termination differed from the disciplinary action taken against similarly situated employees. To prove that other similarly situated employees were treated differently, a plaintiff must show that management was aware of the alleged misconduct, and either chose not to act or acted in a disparate manner. Jones v. Gerwens, 874 F.2d 1534, 1541-42 (11th Cir.1989). Here, Susan Smith, DON, had no knowledge of the other employees' alleged misconduct until informed by plaintiff. And after conducting an investigation, Ms. Smith was unable to substantiate Plaintiff's allegations that other employees falsified patent records. Moreover, during the tenure of Ms. Smith's employment, a white male was the last employee caught falsifying medical records. Ms. Smith terminated that employee, just as she terminated Plaintiff's employment.

Additionally, if an employer had a good faith belief that a plaintiff violated company policy, then the plaintiff's termination is not considered an act of racial discrimination. Smith v. Papp Clinic,P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987). Here, Ms. Smith had a good faith basis to believe that Plaintiff had falsified medical records and that her employment should be terminated. On January 30, 2004, Ms. Smith began an investigation after being informed by Plaintiff's supervisor that Plaintiff had dispensed medication and completed patient assessments in a

suspiciously short amount of time. In her investigation, Ms. Smith reviewed Plaintiff's assessments and spoke with Plaintiff's patients who informed her that Plaintiff had not visited them. Based on her review of Plaintiff's assessment, the statements made by Plaintiff's patients, and the fact that Plaintiff had arrived to work twenty minutes late that morning, Ms. Smith reasonably concluded Plaintiff had falsified her patient assessments. Ms. Smith believed that Plaintiff's duties should have taken plaintiff longer than an hour and a half to complete. Because of the danger to a patient's health posed by the falsification of medical records, Ms. Smith concluded that Plaintiff's conduct warranted termination. In light of the evidence, Ms. Smith had a good faith basis to terminate Plaintiff's employment and therefore Plaintiff cannot support the argument that her termination served as a pretext for racial discrimination.

Here, Plaintiff has not offered evidence that a white employee engaged in nearly identical behavior and was disciplined less severely. On the contrary, there is evidence that a white male employee was terminated when it was discovered that he had falsified medical records. This is an example of a comparator in its truest sense and the punishments doled out were the same, rebutting Plaintiff's allegation that she was terminated because of her race.

**B.    Retaliation**

Plaintiff also claims that she was retaliated against for contacting the Human Resources Manager at the Hospital and complaining about her supervisor. Defendant asserts that Plaintiff's retaliation claim fails because Defendant did not know that Plaintiff had engaged in a protected activity before choosing to terminate Plaintiff's employment. Defendant argues that Plaintiff has not presented any admissible evidence to disprove Defendant's good faith basis for terminating Plaintiff's employment. Under Title VII employers may not "discriminate against . . . [an]

employee[] or applicant[] for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 715 n.1 (11th Cir. 2002). Title VII's protection extends to employees who use their employer's internal grievance procedures. Rollins v. Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989).

There are three steps in analyzing a retaliation claim under Title VII. First, a claimant must establish a prima facie case. Second, if a plaintiff can establish a prima facie case, then the defendant must offer a legitimate, non-retaliatory reason for the adverse employment action. Third, if the defendant offers a legitimate non-discriminatory reason, the plaintiff retains the ultimate burden of proving beyond a preponderance of the evidence that the defendant's actions are pretext for the retaliatory conduct if the claim is to survive. Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

To establish a prima facie case, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). Defendant does not dispute that Plaintiff has met the first and second factors; Defendant contends that Plaintiff cannot demonstrate the causal relationship necessary to meet her burden.

To establish a causal connection, a plaintiff must show that the decision-makers [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (citations, internal

marks, and emphasis omitted).  However, "[i]t is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression."  <u>Bass v. Bd. of County Comm'rs</u>, 256 F.3d 1095, 1119 (11th Cir. 2001).

There is no dispute that Plaintiff's complaining to her Human Resources Manager was a protected expression, and there is no dispute that being put on probation and eventually being terminated qualifies as an adverse employment action.  Therefore, the Court will focus on the third element necessary to establish prima facie case of retaliation: Whether the adverse action was causally related to the protected expression.  Here, there is no indication that Ms. Smith knew that Plaintiff had contacted Ms. Jackson about her troubles with Keith Ryals.  Plaintiff put forth no evidence that Ms. Smith, the ultimate decision maker concerning Plaintiff's probation and eventual termination, had any knowledge of Plaintiff's allegations of harassment by her supervisor.  Without this evidence, Plaintiff cannot establish the causal connection necessary to create a prima facie case of retaliation.  As a result, Defendant is entitled to summary judgment with respect to Plaintiff's retaliation claim.

## C.    Hostile work environment

Plaintiff alleges that her supervisor, Keith Ryals, engaged in a campaign of harassment by making remarks of a racist nature.  According to the Defendant, however, the alleged comments and circumstances do not rise to the level of severity needed to support a hostile work environment claim.  To establish Title VII liability against an employer for maintaining a hostile work environment, Plaintiff must show that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the terms and conditions of [her]

employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  A plaintiff demonstrates this by proving five essential elements: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability.  See Miller v. Kenworth Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

The Court construes Plaintiff's allegations of a hostile work environment to include Keith Ryals's numerous "you people" comments.  Specifically, Plaintiff complained about remarks made by her supervisor prefaced with the words "you people" that she interpreted to be discriminatory in nature.  Throughout the Complaint and her responses to Defendant's motions, Plaintiff alleges only handful of comments–six by the Court's count–where Plaintiff's supervisor made a derogatory remark prefaced with "you people."  Although she only provides six specific comments, Plaintiff alleges that Keith Ryals's use of "you people" remarks persisted for the duration of her employment under his supervision.  While the Court questions Defendant's attempts to defend the neutrality of Keith Ryals's allegedly offensive statements, it is Plaintiff's failure to show that the harassing remarks were sufficiently severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive working environment that prevent her from making out a prima facie case of hostile work environment.  "The Supreme Court has provided a non-exclusive set of factors to consider in determining whether an environment is hostile. 'These may include the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23). Here, although Plaintiff asserts that she found Ryals's numerous comments offensive, she does not provide any evidence that her supervisor's comments prevented her from satisfactorily completing her job requirements. While the Court acknowledges that Plaintiff made attempts to complain about her supervisor's behavior to her Human Resources Manager, Plaintiff continued to go about her daily routine.

The Federal employment discrimination laws are "not a general civility code." Gupta, 212 F.3d at 583. Ryals's remarks, while offensive to Plaintiff, did not rise to the level of creating a hostile work environment. Accordingly, Plaintiff is unable to create a prima facie case of hostile wok environment, and summary judgment in favor of Defendant with respect to this claim is appropriate.

**D.     State law wrongful termination**

Plaintiff alleges a state law claim for wrongful termination. Defendant contends that Plaintiff was an at-will employee and therefore barred by the state law of Georgia from claiming wrongful termination. "[T]he inability of an at-will employee to sue in tort for wrongful discharge is a fundamental statutory rule governing employer-employee relations in Georgia . . . ." Mattox v. Yellow Freight Systems, Inc., 534 S.E.2d 561, 563 (Ga. Ct. App. 2000). It is uncontroverted that Plaintiff was an at-will employee–therefore, Defendant is entitled to summary judgment with respect to Plaintiff's state law wrongful termination claim.

**IV.     CONCLUSION**

Despite Plaintiff's allegations to the contrary, she was unable to meet her burden of

establishing a prima facie case with respect to her claims of discriminatory discipline, retaliation ,

and hostile work environment.  Accordingly, Defendant's Motion for Summary Judgment (doc. 42)

is GRANTED.

SO ORDERED, this 7th day of February, 2008.

<u>**/s/ Hugh Lawson**</u>
HUGH LAWSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

HL/cbb